

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 2786 | **DATE** | 11/22/2004 |
| **CASE TITLE** | Electric Insurance Co., et al. vs. National Union Fire Insurance Co. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiffs' motion for summary judgment [14-2] is granted. Defendant's motion for summary judgment [19-1] is denied. Plaintiff's motion for judgment on the pleadings [14-1] is denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | NOV 2 3 2004 date docketed | 27 |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | RO | courtroom deputy's initials | U.S. DISTRICT COURT 2004 NOV 22 PM 3:45 | date mailed notice mailing deputy initials |
| | | | Date/time received in central Clerk's Office | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ELECTRIC INSURANCE COMPANY and  )
CONTINENTAL CASUALTY COMPANY    )
                                )
        Plaintiffs,             )
                                )
    v.                          )    No. 04 C 2786
                                )
NATIONAL UNION FIRE INSURANCE   )    Judge Ruben Castillo
COMPANY OF PITTSBURGH,          )
                                )
        Defendant.              )

DOCKETED
NOV 2 3 2004

## MEMORANDUM OPINION AND ORDER

This case involves a dispute between three insurance companies arising out of a tragic accident at one of Commonwealth Edison's ("ComEd") nuclear power plants. Gerald Vance, a pipefitter and welder, was severely injured while working at the power plant and secured a $744,497.83 personal injury judgment ("the Vance judgment") against ComEd. Plaintiffs, Electric Insurance Company ("EIC") and Continental Casualty Company ("Continental"), demand that Defendant National Union Fire Insurance Company of Pittsburgh ("National Union") pay a *pro rata* share of this judgment. Both parties have filed motions for summary judgment. For the reasons provided below, we grant Plaintiffs' summary judgment motion, (R. 14-2), and deny National Union's summary judgment motion, (R. 19-1).

### RELEVANT FACTS

ComEd hired Power Systems Energy Services, Inc. ("PSESI"), General Electric ("GE"), and GD Staff & Associates ("GDS") as contractors at its Dresden nuclear power plant in Grundy County, Illinois. (R. 20, Def.'s Resp. ¶ 8.) These three contractors all obtained commercial general liability insurance. (*Id.*) PSESI obtained insurance from National Union. (*Id.* ¶ 23.)

27

Under this policy, ComEd was named as an additional insured, "but only with respect to liability arising out of [PSESI's] operations or premises owned by or rented by [PSESI]." (*Id.* ¶¶ 25, 27.) GE was also insured by National Union, but GE's policy was reinsured by EIC. (*Id.* ¶¶ 29-30.) GDS was insured by Continental. (*Id.* ¶ 28.) The GE and GDS policies both contained subrogation clauses. (*Id.* ¶¶ 33-34.) The GE subrogation clause provided that:

> If the insured has rights to recover all or part of any payment the Company has made under this Coverage Part, those rights are transferred to the Company. the [*sic*] insured must do nothing after loss to impair them. Upon request, the insured will bring suit or transfer those rights to the Company and help enforce them.

(*Id.* ¶ 33.) The GDS subrogation clause provided that:

> If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

(*Id.* ¶ 34.) Both policies also named ComEd as an additional insured. (*Id.* ¶¶ 8, 28.)

ComEd hired PSESI to protect its employees from radiation exposure. (*Id.* ¶ 9.) As part of its contract, PSESI determined the radiological condition of scrap materials being removed from a heat exchanger room undergoing demolition. (*Id.* ¶¶ 12-14.) PSESI instructed the carpenters on how to erect scaffolding and the pipecutters on how to cut pipe to ensure that all work complied with its radiation work permit. (*Id.* ¶¶ 13-14.) PSESI also advised ComEd on how to safely remove, transport, and store the radioactive scrap material. (*Id.* ¶ 12.)

On April 21, 1997, Vance was severely injured when he fell off of some scaffolding in the heat exchanger room. (*Id.* ¶¶ 16-21.) Vance went into the room to inspect a weld—identified as field weld 57—that he had made earlier that day. (*Id.*) Before entering the room, he told Richard Fults, a PSESI radiation technician, that he needed to check field weld 57, and Fults

2

went with him to perform his own inspection. (*Id.*) Fults climbed to the top of the heat exchanger and was waiting for Vance to join him to identify field weld 57. (*Id.*) Vance, however, fell on his way to the top of the heat exchanger.[1] (*Id.*)

Vance explained his accident in the following way:

> And I told him [Fults], I said I've got to go in and check something on Field Weld 57. He said I'll go take a smear. I said well, it's new pipe. I don't know – you, know, you can if you want to. I'll go take a smear so come go with me. So, we go in, and he's ahead of me. He said where is it at? And I said it's up on top of that heat exchanger up there. The way he goes. He went right up the side of that pipe, right up on that heat exchanger. Well, I followed him up.
>
> . . .
>
> He's standing there waiting on me because he don't know where Field Weld 57 is. Well, as I started to go on and try to get on up, this hand slipped off the top of that pipe. . . . But I tried out of reflex to stop myself, and all it amounted to is it spun me around a little bit and I dropped straight down and landed right straddle of that six-inch pipe stub.

(R. 18, Def.'s Opp'n, Ex. B, Vance Trial Transcript at 59-60, 62.) And Fults, the only witness to Vance's accident, described it as follows:

> We entered the heat exchanger -- actually Mr. Vance approached me at our control point that we have established in the RC, radiation controlled, area; told me about some work that he needed to performed [*sic*] in the heat exchanger room; proceeded to follow him into the room. I went up the scaffold, and then as I turned around, Mr. Vance was coming up on the back side of the scaffold on the outside and slipped or lost his footing or hold as he went to reach slipped backwards and landed on -- and I think I stated in my deposition it was approximately a ten-inch pipe that he kind of straddled and landed on that pipe.
>
> . . .
>
> I didn't know the location of the field well [*sic*]. I mean he described the number. They were all designated by numbers, and when they would approach, they would say we are going to field well [*sic*] such and such, so I knew the number, but I didn't

---

[1] One of the critical disputed facts in Vance's personal injury lawsuit against ComEd was whether he fell off of scaffolding or exposed pipes. (*See* R. 11, First Amended Compl., Ex. 6, Fults Trial Transcript at 4-5; R. 18, Def.'s Opp'n, Ex. C, Vance Trial Transcript at 60.) This factual dispute, however, is not material to the resolution of these cross summary judgment motions.

> know where it was in the room, and that's why Mr. Vance was going with me to show me where the field well [*sic*] was.

(*Id.*, Ex. C, Fults Trial Transcript at 4-5, 7-8.) Fults was also asked if it was his "intention at the time to wait until Mr. Vance climbed up on the scaffold to then tell you where field well [*sic*] 57 was located," and he answered:

> Just to see where they were. It was a lot of the stuff we are doing was real small, so you almost had to be real specific when you pointed stuff out if you were doing something specific like that.

(*Id.*, Ex. C, Fults Trial Transcript at 8.)

Vance sued ComEd for his personal injuries. (*Id.* ¶ 35.) Plaintiffs agreed to defend and indemnify ComEd for any liability arising out of Vance's injury. (R. 26, Pls.' Resp. ¶¶ 13, 16.) ComEd requested that National Union also share the cost of its defense with EIC and Continental on a *pro rata* basis in January 2001 and February 2002. (R. 20, Def.'s Resp. ¶¶ 36-37.) National Union agreed in August 2002 to defend ComEd under a reservation of rights. (*Id.* ¶ 39.) Vance prevailed at trial and obtained a $744,497.83 judgment against ComEd, which Plaintiffs paid. (R. 26, Pls.' Resp. ¶¶ 15-16.) National Union asserts that it has no duty to indemnify ComEd because Vance's injury did not arise out of PSESI's operations, so it has not paid any part of the Vance judgment. (R. 20, Def.'s Resp. ¶ 43; R. 26, Pls.' Resp. ¶ 18.)

## LEGAL STANDARDS

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When determining whether a genuine issue of material

4

fact exists, this Court evaluates all admissible evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 975 (7th Cir. 2004). This Court will only grant summary judgment if a trial is not required because no rational trier of fact could rule in the non-moving party's favor. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 502 (7th Cir. 2004).

## ANALYSIS

Plaintiffs filed a motion for judgment on the pleadings or, in the alternative, summary judgment, and National Union filed its own summary judgment motion. We do not address Plaintiffs' motion for judgment on the pleadings because it is more efficient to directly address the cross summary judgment motions. No motions to dismiss were filed in this case, so we must first determine whether Plaintiffs have stated an actionable claim. If we find that they have, we will then determine whether National Union has a duty to indemnify ComEd and whether National Union is estopped from raising any coverage defenses.

### I.     Plaintiffs' Amended Complaint

Plaintiffs' amended complaint seeks damages under five alternate legal theories: (1) breach of contract; (2) equitable contribution; (3) equitable subrogation; (4) unjust enrichment; and (5) declaratory judgment. Throughout this section we assume that National Union has a duty to indemnify ComEd in order to determine whether any of Plaintiffs' five legal theories would entitle them to damages.

#### A.     Breach of Contract

ComEd has an actionable breach of contract claim against National Union (assuming that National Union has a duty to indemnify ComEd) because National Union has not indemnified

ComEd. Plaintiffs, however, can only recover damages from this breach of contract if they are subrogated to ComEd's breach of contract claim, *i.e.*, if they have the right to bring ComEd's breach of contract claim on their own behalf. *See* 16 Couch on Ins. 3d § 222:5 (2000). Plaintiffs can have this right through contractual or equitable subrogation.[2] *Union Planters Bank, N.A. v. FT Mortgage Co.*, 794 N.E.2d 360, 364 (Ill. App. Ct. 2003). Contractual subrogation arises out of a contract while equitable subrogation arises out of the court's equitable powers. If Plaintiffs are contractually or equitably subrogated to ComEd's breach of contract claim and if National Union had a duty to indemnify ComEd, they would be entitled to damages under a breach of contract theory.

### 1.   Contractual Subrogation

Plaintiffs assert that they are contractually subrogated to ComEd's breach of contract claim. "The right of an insurer to subrogation is measured by and depends solely on the terms of the subrogation provisions in the contract." *Hack v. Multimedia Cablevision, Inc.*, 696 N.E.2d 694, 696 (Ill. App. Ct. 1998). Thus, in order to determine whether Plaintiffs are entitled to bring ComEd's breach of contract claim against National Union on their own behalf, we must examine their insurance contracts with ComEd.

EIC is not contractually subrogated to ComEd's breach of contract claim because it does not have a contractual relationship with ComEd. *See Reliance Ins. Co. v. Aerodyne Eng'rs Inc.*, 612 N.Y.S.2d 87, 87-88 (N.Y. App. Div. 1994). EIC only reinsured National Union's insurance policy with GE, so its contractual rights stem solely from this reinsurance contract. EIC has not

---

[2] Plaintiffs brought a breach of contract claim based on contractual subrogation and a separate equitable subrogation claim. Consistent with our analysis, we construe their equitable subrogation claim as a breach of contract claim based on equitable subrogation.

asserted, let alone established, that it obtained National Union's contractual subrogation rights under the reinsurance contract.

Continental, however, is contractually subrogated to ComEd's breach of contract claim. The subrogation clause in Continental's insurance policy transferred to Continental ComEd's "rights to recover all or part of any payment" made by Continental. Continental has paid part of the Vance judgment, and ComEd's breach of contract claim against National Union is a right to recover part of that payment. Therefore, Continental is contractually subrogated to ComEd's breach of contract claim.

National Union asserts that contractual subrogation only gives Continental the right to recover payments made to tortfeasors.[3] The subrogation clause does not contain this limitation. It clearly and unambiguously states that Continental has a right to recover "all or part of any payment." National Union, nevertheless, asserts that *Bituminous Casualty Corporation v. Royal Insurance Company of America*, 704 N.E.2d 74, 79 (Ill. App. Ct. 1998), justifies limiting contractual subrogation to payments made by tortfeasors because the court stated in that case that a subrogation clause "transfers to the insurer remedies that the insured may have against a tortfeasor." Yet the issue in *Bituminous Casualty* was whether a subrogation clause transferred an insured's right to select exclusive coverage. *Id.* The court's definition of subrogation was

---

[3] National Union also asserts that contractual subrogation only gives Continental the right to recover involuntary payments. The contractual subrogation clause does not contain this limitation, but even if it did, Continental's payment was involuntary because Continental was legally obligated to pay ComEd's liability. *See* 16 Couch on Ins. 3d §§ 223:27 & 223:31 (2000). Regardless, involuntariness is a tenet of equitable subrogation which is not applicable to contractual subrogation. *Wausau Ins. Co. v. All Chicagoland Moving and Storage Co.*, 777 N.E.2d 1062, 1072 (Ill. App. Ct. 2002).

merely to distinguish an insurer's subrogation rights from an insured's right to select exclusive coverage. *Id.* Furthermore, the court stated a subrogation clause "transfers to the insurer the right to sue *any party* whom the insured could have sued" and stated that the "concept of subrogation *generally* involves actions against tortfeasors." *Id.* (emphasis added). *See also* 16 Couch on Ins. 3d § 223:40 (2000) (stating that "subrogation to contract rights has been often recognized"). Therefore, *Bituminous Casualty* does not support National Union's argument.

### 2. Equitable Subrogation

An insurer is equitably subrogated to an insured's rights when it involuntarily pays and thereby extinguishes a third party's obligation to the insured. *Progressive Ins. Co. v. Universal Cas. Co.*, 807 N.E.2d 577, 585 (Ill. App. Ct. 2004). Equitable subrogation is the appropriate remedy when one who is secondarily liable satisfies a debt for which another is primarily liable.[4] *Home Ins. Co. v. Cincinnati Ins. Co.*, 801 N.E.2d 997, 1000 (Ill. App. Ct. 2003). EIC is not equitably subrogated to ComEd's rights because National Union, if it has a duty to indemnify, and EIC are equally liable for the Vance judgment. When co-obligors are equally liable for a debt, the appropriate equitable remedy, as discussed in more detail below, is equitable contribution.[5] *See Progressive Ins. Co. v. Universal Cas. Co.*, 807 N.E.2d 577, 584 (Ill. App. Ct. 2004).

---

[4] EIC asserts that its liability should be considered secondary because it is a reinsurer. (R. 14-2, Pls.' Mem. at 12 n.4.) EIC has provided this Court with no authority for the principle that a reinsurer is secondarily liable, so it has not established that it is entitled to judgment as a matter of law on this basis.

[5] Continental is also not equitably subrogated to ComEd's rights because its subrogation rights are only governed by its contractual subrogation clause. *See* 16 Couch on Ins. 3d § 222:23 (2000) (citing *Hack*, 696 N.E.2d at 696, and *Capitol Indem. Corp. v. Strike Zone*, 646 N.E.2d 310, 312 (Ill. App. Ct. 1995)).

8

## B. Equitable Contribution

"The right to equitable contribution arises when one insurer pays money for the benefit of another insurer." *Am. Nat'l Fire Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 796 N.E.2d 1133, 1136 (Ill. App. Ct. 2003). Equitable contribution "permits an insurer that has paid [an] entire loss to be reimbursed by other insurers that are also liable for the loss." *Cincinnati Ins. Co. v. River City Constr. Co.*, 757 N.E.2d 676, 682 (Ill. App. Ct. 2001). To be entitled to equitable contribution, Plaintiffs and National Union must share the same liability, which means that the insurance policies giving rise to the liability covered identical parties, interests, and risks. *Schal Bovis, Inc. v. Cas. Ins. Co.*, 732 N.E.2d 1179, 1186 (Ill. App. Ct. 2000).

The parties dispute whether they share the same liability. National Union asserts, relying on *Schal Bovis*, that the various insurance policies covered different risks because the policies have three different named insureds. The Appellate Court for the First District held in *Schal Bovis*, 732 N.E.2d at 1187, that insurance policies with different named insureds covered different risks because they only provided coverage to the additional insured for liability that arose out of the named insured's operations. Plaintiffs, however, assert that this interpretation of identical risks unfairly benefits an insurer who failed to indemnify the additional insured. The Appellate Court for the Third District in *River City*, 757 N.E.2d at 682, declined to adopt the *Schal Bovis* analysis for this precise reason. The Third District held that, even though two policies had different named insureds, the policies covered the same risk because the additional insured "was insured for [liability arising out of an employee's injury] under both policies." *Id.*

Given this split among the Illinois Appellate Courts, we must predict how the Illinois Supreme Court would resolve this issue. *S. Ill. Riverboat Casino Cruises, Inc. v. Triangle*

9

*Insulation & Sheet Metal Co.*, 302 F.3d 667, 674 (7th Cir. 2002). We find that the Illinois Supreme Court would adopt the *River City* analysis because it is simple, equitable, and promotes the prompt payment of claims. Using the *River City* analysis a court determines whether various policies cover the same risk by determining whether the various insurers have a duty to indemnify the insured for the same loss. This straightforward analysis ensures that liability is shared equitably because all insurers who have a duty to indemnify will also have a duty to contribute. In this way it promotes prompt payment because an insurer can promptly pay a claim knowing that all other insurers who are ultimately found to have a duty to indemnify will also have a duty to contribute.

The Illinois Supreme Court would not adopt the *Schal Bovis* analysis because the *Schal Bovis* court incorrectly determined whether two policies cover the same risk by comparing the amount of coverage provided by each insurance policy. 732 N.E.2d at 1187. The court held that two policies covered different risks because the scope of coverage provided to the additional insured under either policy was limited to liability that arose out of the named insured's operations. In other words, the additional insured would be afforded more coverage as the size of the named insured's operations increased. This analysis is flawed because the scope of coverage, or the amount of risk covered, does not identify which precise risks are covered. And more importantly, two different policies with different coverage scopes could overlap and simultaneously cover the same risk. *See Lenny Szarek, Inc. v. Maryland Cas. Co.*, No. 1-03-3703, 2004 WL 2157684, at *6 (Ill. App. Ct. Sept. 27, 2004) (stating that damages may be divided "based on established principles of equitable contribution" between two insurers "with overlapping coverage"); *see also* 15 Couch on Ins. 3d § 218:6 (2000). When the named insureds

are working closely together—like the named insureds in the present case—the coverage provided to the additional insured under each policy will surely overlap to some degree. The best way to determine whether a risk was covered by various policies is to determine whether the various insurers have a duty to indemnify a loss that arises out of that risk, which is exactly what the court in *River City* did.

The Illinois Supreme Court would also reject the *Schal Bovis* analysis because it leads to inequitable results by permitting an insurer who has a duty to indemnify to benefit from another insurer's actions. *See River City*, 757 N.E.2d at 682. The possibility of an inequitable result will also delay payments. Insurers will either deny their duty to indemnify in the hope that another insurer will extinguish its obligations or they will delay fully satisfying a claim until the conclusion of all of legal proceedings concerning other insurer's duties to indemnify. The *River City* analysis, unlike the *Schal Bovis* analysis, promotes prompt payments and equitable results.

Applying the *River City* analysis to the present case, we conclude that Plaintiffs will be entitled to damages on the basis of equitable contribution (if we find that National Union had a duty to indemnify ComEd) because the various insurance policies all covered the same risk: Vance's injury. We do not address National Union's unjust enrichment and declaratory judgment claims because we have already found that Plaintiffs would both be entitled to damages on the basis of equitable contribution and that Continental is contractually subrogated to ComEd's breach of contract claim.

## II. National Union's Duty to Indemnify

National Union agreed to indemnify ComEd "with respect to liability arising out of [PSESI's] operations or premises owned by or rented by [PSESI]." (R. 20, Def.'s Resp. ¶¶ 25,

11

27.) ComEd incurred $744,497.83 in liability as a result of the Vance judgment, so the question before this Court is whether National Union has a duty to indemnify ComEd. Under the insurance policy, National Union has a duty to indemnify ComEd if the Vance judgment arose out of PSESI's operations. To determine whether National Union must indemnify ComEd, we must, therefore, determine whether Vance's injury arose out of PSESI's operations.

The "arising out of" requirement is satisfied if ComEd's liability originated from, has its origin in, grew out of, or flowed from PSESI's operations.[6] *Md. Cas. Co. v. Chi. & N. W. Transp. Co.*, 466 N.E.2d 1091,1094 (Ill. App. Ct. 1984). The phrase "arising out of" is broad, vague, liberally construed in favor of the insured, and satisfied by "but for" causation. *Id.* "But for" causation exists when something would not have happened but for some other prior act. For example, in *Maryland Casualty*, an employee of the named insured was assaulted as she arrived to work, and the court held that she would not have been assaulted but for the fact that she was going to work for the named insured. *Id.* In fact, every Illinois court that has found "but for" causation in the additional insured context has done so because the injured party was, like the injured party in *Maryland Casualty*, the named insured's employee.[7]

---

[6] Plaintiffs rely on *Aryainejad v. Economy Fire & Casualty Company*, 663 N.E.2d 1107, 1109 (Ill. App. Ct. 1996), to advance a slightly broader interpretation of "arising out of"—"originating from, incident to, or having a causal connection with." The court in *Aryainejad*, however, was interpreting a automobile insurance policy and rejected a "but for" causation test in lieu of a "reasonable contemplation" test. *Id.* at 1111. *See also Ramirez v. State Farm Mut. Auto. Ins. Co.*, 771 N.E.2d 619, 626 (Ill. App. Ct. 2002). Neither party asserts that the "reasonable contemplation" test is relevant to the present dispute, so we have not considered it.

[7] *See Liberty Mut. Ins. Co. v. Westfield Ins. Co.*, 703 N.E.2d 439, 443 (Ill. App. Ct. 1998) (finding that "but for" causation exists because the named insured's employee was injured while working on the additional insured's project); *Am. States Ins. Co. v. Liberty Mut. Ins. Co.*, 683 N.E.2d 510, 513 (Ill. App. Ct. 1997) (finding that "but for" causation exists because "'but for'

Because Vance was not an employee of the named insured (PSESI), National Union asserts that, in order for ComEd's liability to arise out of PSESI's operations, Vance's injury must have been "uniquely facilitated" by a PSESI employee. (R. 18, Def.'s Opp'n at 5-6, 8.) We disagree. National Union has provided no support—nor has this Court identified any—for replacing "but for" causation with a much stricter "unique facilitation" standard.[8] More importantly, limiting "but for" causation to certain situations or limiting the type of facts that could establish "but for" causation would be inconsistent with Illinois courts' admonition that the phrase "arising out of" should be broadly and liberally construed in favor of the insured. *See Maryland Casualty*, 466 N.E.2d at 1094. No Illinois court has qualified this broad interpretation of "arising out of," and, while they have held that the injured party's status as an employee of the named insured is sufficient to establish that liability arose out of the named insured's operations,

---

[the injured party's] employment by [the named insured] and [the named insured's] presence on the job site, [the injured party] would not have been injured"); *Shell Oil Co. v. AC&S, Inc.*, 649 N.E.2d 946, 952 (Ill. App. Ct. 1995) (finding that "but for" causation exists because "[t]he injuries would not have occurred 'but for' [the injured party's] employment by [the named insured] and [the named insured's] presence on [the additional insured's] premises"). *See also AMEC Constr. Mgmt., Inc. v. Regent Ins. Co.*, No. 03 C 2880, 2004 WL 816720, at *4 (N.D. Ill. March 12, 2004).

[8] National Union also asserts that a different analysis is warranted because, while the question in *Maryland Casualty* was whether a duty to defend existed, the question in this case is whether a duty to indemnify exists. *Id.* at 6. This difference does not alter how "arising out of" should be interpreted; it only alters the evidence needed to establish a duty. *See Progressive Universal Ins. Co. of Ill. v. Liberty Mut. Fire Ins. Co.*, 806 N.E.2d 1224, 1226 (Ill. App. Ct. 2004) (stating that an insurer has a duty to defend if "the allegations of the underlying complaint, when liberally construed in favor of the insured, *potentially* fall within a policy's coverage" and that an insurer has a duty to indemnify "if the insured's activity and the resulting loss or damage *actually* fall within a policy's coverage") (emphasis in original).

13

none have held that it is a necessary condition.[9] The absence of an employment relationship between the injured party and the named insured simply forces a plaintiff to prove "but for" causation with different facts, which is precisely what Plaintiffs are attempting to do.

Taking all reasonable inferences in favor of National Union, we find that Vance's injury arose out of PSESI's operations. Vance and Fults both stated that Vance was climbing the scaffolding so that he could identify field weld 57. (R. 18, Def.'s Opp'n, Ex. B, Vance Trial Transcript at 62 & Ex. C, Fults Trial Transcript at 8.) Even though National Union asserts that Vance identified the weld before he started to climb the scaffolding, (*id.* at 7-8), the only evidence in the record that could possibly support this conclusion is Vance's statement that he told Fults that field weld 57 is "up on top of that heat exchanger up there," (*id.*, Ex. C., Vance Trial Transcript at 59-60). It would be unreasonable to infer from this statement that Vance identified the weld from the floor of the room. Both Vance and Fults stated that Vance was climbing the scaffolding to identify field weld 57 for Fults, and Fults stated that "a lot of the stuff we are doing was real small, so you almost had to be real specific when you pointed stuff out if you were doing something specific like that." (*Id.*, Ex. C, Fults Trial Transcript at 8.) Therefore, we conclude as a matter of law that Vance was climbing the scaffolding to identify field weld 57 for Fults and would not have been injured but for Fults' inspection of field weld 57.

The record demonstrates, however, that Vance would have inspected field weld 57 even if Fults had decided not to perform his own inspection. (*Id.*, Ex. B., Vance Trial Transcript at 59.)

---

[9] We note that one of our fellow Northern District of Illinois judges, Judge Hart, speculated, in *AMEC*, 2004 WL 816720, at *5, that the absence of an employment relationship could make the use of "but for" causation inappropriate if the plaintiff could not prove proximate causation. Judge Hart, however, was not confronted with such a scenario and even described it as "not necessarily a likely scenario." *Id.*

This fact does not negate "but for" causation because it would be unreasonable to infer that Vance, in the absence of Fults' inspection, would have climbed up to field weld 57 in exactly the same way. Both Vance and Fults stated that Fults started climbing up to field weld 57 first, (*id.*, Ex. B, Vance Trial Transcript at 60-61 & Ex. C, Fults Trial Transcript at 4), and Vance explicitly stated that he followed Fults's path, (*id.*, Ex. B, Vance Trial Transcript at 61). Regardless, Vance was injured while enabling Fults to perform a PSESI inspection, so his injury originated from, had its origin in, grew out of, or flowed from PSESI's operations. *Maryland Casualty*, 466 N.E.2d at 1094. In short, it arose out of PSESI's operations.

Plaintiffs also assert that Vance's injury arose out of PSESI's operations because one of PSESI's operations was "set[ting] forth the expectations as outlined in the radiation work permit pertaining to the installation of scaffold on the project." (R. 20, Def.'s Resp. ¶ 14.) We cannot, however, determine from the record what expectations are outlined in the radiation work permit, what precise role PSESI had in the erection of scaffolding, or whether sufficient scaffolding was present in the heat exchanger room to satisfy PSESI's obligations. For these reasons, we cannot find as a matter of law that Vance's injury arose out of PSESI's failure to comply with the radiation work permit's expectations.

**III.    Estoppel**

An insurer who believes that it has no duty to defend cannot simply refuse to provide a defense. *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122, 1134-35 (Ill. 1999). It must either defend the insured under a reservation of rights or seek a declaratory judgment. *Id.* If the insurer does neither and is subsequently found to have wrongfully refused to provide a defense, the insurer will be estopped from raising any coverage defenses, except when

15

there is a serious conflict of interests. *Id.* at 1135, 1137. Furthermore, the insurer must act "within a reasonable time of a demand by the insured."[10] *Korte Constr. Co. v. Am. States Ins.*, 750 N.E.2d 764, 770 (Ill. App. Ct. 2001); *see also W. Am. Ins. Co v. J.R. Constr. Co.*, 777 N.E.2d 610, 620 (Ill. App. Ct. 2002).

ComEd requested a defense in January 2001, (R. 20, Def.'s Resp. ¶ 36.), and National Union agreed to defend ComEd under a reservation of rights nineteen months later in August 2002, (*id.* ¶ 39). In *Korte,* 750 N.E.2d at 770, the court held that an insurer who did not act for twelve months was estopped from asserting any coverage defenses. And in *J.R. Construction*, 777 N.E.2d at 620, the court held that an insurer who did not act for twenty-one and a half months was also estopped. National Union waited nineteen months, so we conclude that this delay was unreasonable as a matter of law. National Union provided this Court with no justification for waiting such a long time to agree to defend ComEd under a reservation of rights. Instead, it asserts it can only be estopped if ComEd was prejudiced. (R. 18, Def.'s Opp'n at 9.) The absence of prejudice, however, is the direct result of Plaintiffs' prompt decision to provide ComEd with a defense. "An insurance company cannot 'simply stand on the sidelines' because

---

[10] Illinois courts have advanced two alternate definitions of timeliness: (1) acting before the underlying litigation is resolved, *Pekin Insurance Company v. Allstate Insurance Company*, 768 N.E.2d 211, 214 (Ill. App. Ct. 2002); and (2) acting before the resolution of the underlying litigation is imminent, *Aetna Casualty & Surety Company v. O'Rourke Bros., Inc.*, 776 N.E.2d 588, 596 (Ill. App. Ct. 2002). Were the Illinois Supreme Court to address this issue, it would reject both of these definitions because they disregard the time period between the insured's demand and the insurer's actions. These definitions tie timeliness to the progress of the underlying litigation, rather than to the insurer's actions. Defining timeliness in relation to the insurer's actions promotes prompt action because the chance of estoppel increases the longer the insurer waits to act. *See Employers Reinsurance Corp. v. E. Miller Ins. Agency, Inc.*, 773 N.E.2d 707, 720 (Ill. App. Ct. 2002); *see also* Stanley C. Nardoni and John S. Vishneski, III, *The Illinois Estoppel Doctrine Revisited: How Promptly Must an Insurer Act?*, 24 N. Ill. U. L. Rev. 211 (2004).

another insurance company performs its own contractual duties." *J.R. Construction*, 777 N.E.2d at 620 (quoting *Cent. Mut. Ins. Co. v. Kammerling*, 571 N.E.2d 806, 810 (Ill. App. Ct. 1991)). Therefore, we conclude that National Union is estopped from raising any coverage defenses.

## CONCLUSION

National Union has a duty to indemnify ComEd for the liability that arose out of Vance's injury. It has not indemnified ComEd and is estopped from raising any coverage defenses. Plaintiffs have paid the entire Vance judgment and thereby extinguished National Union's obligation to ComEd. Equity requires that National Union contribute its *pro rata* share of the Vance judgment to Plaintiffs: $247,715.80 plus statutory interest accruing from the date Plaintiffs paid the Vance judgment. Continental is also entitled to these damages because it is contractually subrogated to ComEd's breach of contract claim. Accordingly, we grant Plaintiffs' motion for summary judgment, (R. 14-2), and deny National Union's motion for summary judgment, (R. 19-1). We also deny Plaintiffs' motion for judgment on the pleadings as moot. (R. 14-1.) Plaintiffs should promptly file a motion for the reasonable attorneys' fees and costs that they are entitled to under Illinois law. The Clerk of the Court is instructed, pursuant to Federal Rule of Civil Procedure 58, to enter judgment in favor of Plaintiffs Continental and EIC and against Defendant National Union.

ENTERED:

Judge Ruben Castillo
United States District Court

Dated: November 22, 2004

17